# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# SOUTHERN DIVISION

| | |
|---|---|
| WAGNER INVESTMENT COMPANY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) Civil Case No. 05-3012-CV-S-FJG |
| | ) |
| REGIONS BANK f/k/a UNION | ) |
| PLANTERS BANK, | ) |
| | ) |
| Defendant. | ) |

## ORDER

Currently pending before the Court is Defendant's Motion for Summary Judgment (Doc. # 47) and defendant's Motion in Limine (Doc. # 73).

## I. BACKGROUND

In September 1999, Wagner Investment Company ("WIC") entered into a business relationship with Len Bestgen and CSO Funding Trust. The purpose of the relationship was to realize profits from an investment opportunity presented to WIC by Bestgen. As part of the agreement, plaintiff was to deliver $500,000 to a third party, International Banque Holding Company ("IBHC") to be utilized to fund the investment opportunity. On December 21, 1999, plaintiff delivered $500,000 to IBHC by way of a cashier's check. As it was a cashier's check, the bank was the drawer and the drawee on the check. On December 23, 1999, IBHC deposited the cashier's check into its bank account at Regions Bank in Florida. Regions was formerly known as Union Planters Bank. On December 27, 1999, Union Planters was presented with two checks issued upon IBHC's account at Regions, check numbers 1550 and 1552, in the amounts of

$400,000 and $100,000 and payable to Jamar. Upon presentment of the checks by Jamar for payment, Union Planters issued Jamar three official bank checks totaling $500,000. The present suit seeks to rescind the negotiation of the checks and to tie Union Planters to the fraud committed by John Macari, Jamar Enterprises, Inc., George Manter and International Banque Holding Corporation. Plaintiff's petition asserts two causes of action against the Bank, Count I: Rescission and Count II: Aiding and Abetting Theft.

## II. STANDARD

A moving party is entitled to summary judgment on a claim only if there is a showing that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "[T]he substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). If the moving party meets this requirement, the burden shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. 242, 248 (1986). In Matsushita Electric Industrial Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986), the Court emphasized that the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts" in order to establish a genuine issue of fact sufficient to warrant trial. In reviewing a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party, giving that party the benefit of all inferences that may be reasonably drawn from the evidence. Matsushia, 475 U.S. 574, 588; Tyler

v. Harper, 744 F.2d 653, 655 (8th Cir. 1984), cert. denied, 470 U.S. 1057 (1985).

### III. DISCUSSION

Defendant moves for summary judgment on three issues: 1) plaintiff's petition is barred by the Florida four year statute of limitations applicable to fraud actions; 2) plaintiff is unable to evidence a legal or equitable right to establish its right to rescind the negotiation of the checks by Jamar to the bank and 3) plaintiff is unable to evidence that the bank knew of the third parties' scheme to defraud WIC or that the bank substantially assisted the third parties' scheme to defraud plaintiff.

**A. Statute of Limitations**

In the Order denying defendant's Motion to Dismiss, the Court ruled that the applicable statute of limitations for plaintiff's claims was the Florida statute of limitations for fraud, Fla. Stat. § 95.11(3)(j). In Wilder v. Meyer, 779 F.Supp. 164 (S.D.Fla. 1991), the Court stated:

> The four-year statute of limitations period commences to run from the date Plaintiff discovered or should have discovered the facts giving rise to the cause of action with the exercise of due diligence. Fla.Stat. § 95.031(2). In determining the standard for when the Plaintiff should have been on notice of the alleged fraud, he is charged with knowledge of the facts which could have been discovered in the exercise of due diligence. However, the law of fraud "does not require that an aggrieved party have proceeded from the outset as though he were dealing with thieves." First Federal Sav. and Loan Ass'n of Wisconsin v. Dade Federal Sav. and Loan Ass'n, 403 So.2d 1097, 1100 (5th DCA 1981).

Id. at 168.

In Pacific Harbor Capital, Inc. v. Barnett Bank, N.A., No. 2:97-CV-416-FTM-24D, 2000 WL 33992234 (M.D.Fla. Mar. 31, 2000), aff'd, 252 F.3d 1246 (11th Cir. 2001), the

3

Court noted:

> The statute of limitations for fraud begins to accrue when a plaintiff is on notice of the possible invasion of [its] legal rights. . . . It is not necessary for the plaintiff to know all elements of his alleged cause of action, including the element of fraudulent intent. . . . All that is required is that plaintiff had notice of the alleged injury and of the transaction involving defendant resulting in the injury.

Id. at *12 (internal citations and quotations omitted).

Defendant argues that plaintiff had notice of the invasion of its legal rights, at the latest, in April 2000. By then, plaintiff knew that the Trading Program was not proceeding as promised. Plaintiff had been promised that: 1) a trade would be made by the end of 1999; 2) full trading would commence in early January 2000; 3) the $500,000 would be deposited into an account under International Banque Holding Company ("IBHC's") control; 4) the $500,000 would be used by IBHC to fund the expenses of the Trading Program and 5) plaintiff would realize significant financial return from the Trading Program in weekly profit distributions. Defendant argues that by April 2000, plaintiff knew the following: 1) no trades had been made pursuant to the Trading Program by the end of 1999; 2) there had been no trades within 30 days of plaintiff's $500,000 payment or at any time thereafter; 3) the $500,000 had not remained under IBHC's control, but instead had been paid to Jamar; 4) the $500,000 had not been utilized to fund the trading program and 5) plaintiff had received no financial return from the program.

In his deposition, Mr. Wagner testified as follows:

Q. Let's go right there. After you sent the $500,000 in, what was the next thing that you anticipated or expected would occur if this transaction had gone as you had contemplated it should go?

4

A. Mr. Bestgen's letter, which you've marked as Exhibit No. 5, indicated to me that a trade would commence, and I'm referring to paragraph - okay - two. That a minium of one trade will be completed and profits distributed before the new year, and that the full trading commence sometime after the first of the year. So I expected that there would be some activity in this account by virtue of that one trade before the end of 1999.

Q. . . . Did you come to learn at some point in time that no trade occurred in 1999?

A. Well, I came to learn that at some point, yes.

Q. What I'm trying to find out is sort of what happened after you put the $500,000 in. What did you learn from whom and when? Certainly, based on the answers you've given me today, at some point in time you learned that the transaction, as you contemplated, didn't occur. So, let's start with when did you first learn that the transaction, as you've contemplated it, did not occur?

A. Sometime in early 2000. Sometime in the first quarter of 2000. Now, to be specific, I obviously learned that the trading that was to take place before the end of the year did not occur, but that does not imply that I had an understanding at that time that the entire deal had unwound.

(Wagner Depo. pp. 106-107).

He further testified:

Q. So you learned in April that Macari had gotten money out of the IBHC by having checks made against that account?

A. To be honest with you, I wasn't certain how he got the funds. And I frankly didn't know whether to believe George, as kind of the new relationship to me in this transaction. But what I knew is that my demands for my money back were not being met. Now, whether they remained with IBHC and he wasn't being genuine with me, whether he was truthful that Macari had confiscated funds, made off with funds, did what he had done, whether that was the truth or not, I'm not sure I really was convinced one way or the other. Again, I reassert that Manter and Bestgen would give their explanation as to what happened to these funds at the same time as described as to what they are doing moving forward and how they are making good on the transaction.

Q. When did you first make demand for return of your $500,000?

A. I failed to make a vehement demand of return other than through the course of conversation to Mr. Bestgen and Manter, that, Hey if we're going to move forward, let's do that, just give me my money back. Well, we can't do that, but

5

> we're doing what we can. Well, why can't you do that? Because they left our control.

Q. That is in that April 2000 time period?

A. Yeah. I'd say that's fair to characterize it around that time frame.

Q. Was it April or earlier in 2000 that you learned that the funds had not been placed with – in a trading program?

A. Yeah. Bestgen and Manter were acting as though the funds were still behind the potential for successful transaction. In other words, it was not clear to me that the objective that we were all trying to reach was completely awash and gone. So the actual whereabouts with those funds was not known to me. Now whether Macari was in the deal as the party leading to the trading, or whether it was IBHC, it was as though they're working hard to make that happen. That they're continuing to endeavor to successfully implement a program. It wasn't a bunch of finger pointing toward one guy for making off, so to speak, at that point in time. They were still in the boat together.

(Wagner Depo. pp. 112 - 115).

Defendant argues that based on this testimony, plaintiff knew in April 2000, that its legal rights were being invaded - the demands for the return of the money were not being met, plaintiff knew that IBHC had transferred the money to Jamar and that Jamar had received the money by presenting checks written on IBHC's account. Defendant argues that with this knowledge, plaintiff had sufficient information to make further inquiry regarding IBHC's depository bank.

Plaintiff argues in response that the lawsuit is timely because the earliest that WIC could have known that its legal rights had been invaded was in April 2003. Plaintiff argues that there are two genuine, material issues of fact which exist regarding when WIC discovered the fraud and which preclude the entry of summary judgment. The Court will discuss each of those issues in turn.

6

**1. Reliance Upon Fiduciary**

First, WIC disputes that by April 2000, it knew or was on notice that its legal rights had been invaded. WIC states that it was a joint venture partner with CSO Funding Trust. CSO Funding Trust was represented by its Trustee, Leonard Bestgen. Bestgen and the Trust were the "Advisor" to WIC in investing in the trading program. WIC argues that Bestgen and CSO Funding Trust were financial experts who stood in a fiduciary capacity towards WIC. WIC argues that Florida recognizes that reliance upon a fiduciary can be considered in determining when a party discovered or should have discovered a cause of action. WIC states that it placed all its trust in Bestgen in all dealings with Manter and Macari and that it is for the jury to determine whether WIC's reliance on Bestgen was reasonable.

WIC cites to Jones v. Childers, 18 F.3d 899 (11th Cir. 1994) as support for the argument that Florida recognizes that reliance upon a fiduciary can be considered in determining when a party discovered or should have discovered a cause of action. WIC argues that it placed its trust in Bestgen in all dealings with Macari and Manter and that WIC did not speak or meet with Manter or Macari before sending the $500,000 in December 1999. In Jones, the Court stated, "[w]e note, however, that a fraud victim bears a less demanding due diligence burden where the perpetrator is rendering an expert service while standing in a fiduciary capacity." Id. at 907 (internal quotations and citations omitted). The Court questions whether there was a fiduciary relationship between WIC, Bestgen and the Trust. However, even assuming there was a fiduciary relationship based on the Joint Venture Agreement, the Court finds that this fact to be irrelevant. WIC is a privately held limited liability company. The membership interests

are owned by Vincent and Joseph Wagner. "WIC is engaged in making private investments for profit and making charitable donations." (Petition ¶ 6). WIC and its members were clearly sophisticated investors. In the Jones case the plaintiffs were a married couple who had no experience with investments and no business background. Additionally, it is clear from Mr. Wagner's deposition testimony that he was having conversations not just with Mr. Bestgen, but also with Manter and Macari. Mr. Wagner testified as follows:

Q. But sometime in the first four months, then, of 2000, because I think you said by April. Sometime in the first four months of 2000, you were aware that Macari had the funds as opposed to IBHC?

A. Yes. That's true. I had the knowledge from Mr. Bestgen that one of the parties the transaction had the funds. And I was also informed by him that – and *I believe by Manter at that time that I had direct contact with* - that all parties were moving forward to complete the transaction, but that Macari had the funds in his mitts.

Q. Did Mr. Manter or Mr. Bestgen tell you how or why Mr. Macari had the funds?

A. Not in so many words. Not directly is what I mean by that.

Q. Okay. What did they tell you indirectly that relates to something that led you to make some conclusions about how Mr. Macari had gotten the funds?

A. I would say it was April. *And Manter, I believe it was, had disclosed to me and Bestgen that had he prepared the checks*, you know, in payment for and under the conditions of the joint venture agreement.

Q. So you learned in April that Macari had gotten the money out of the IBHC by having checks made against that account?

A. To be honest with you, I wasn't certain how he got the funds. And I frankly didn't know whether to believe George, as kind of the new relationship to me in this transaction. But what I knew is that my demands for my money back were not being met. . . . Again, I reassert that *Manter and Bestgen would give their explanation* as to what happened to these funds at the same time as described as to what they are doing moving forward and how they are making good on the transaction.

8

Q. When did you first make demand for return of your $500,000?

A. I failed to make a vehement demand of return other than *through the course of conversation to Mr. Bestgen and Manter*, that Hey, if we're going to move forward, let's do that, just give me my money back. Well, we can't do that, but we're doing what we can.

(Wagner Depo. pp. 111-113)(emphasis added).

It is clear from a review of Mr. Wagner's deposition testimony that after he initially sent the check to IBHC, but did not receive any returns on the investment, he began making inquiries on his own. Mr. Wagner did not rely solely on Mr. Bestgen, but also had conversations with Mr. Manter as to where the money was and why the trading program had not gotten underway. Thus, unlike the unsophisticated investors in Jones, Mr. Wagner was obviously a sophisticated investor who did not rely solely on his fiduciary joint venture partner. Thus, the Court does not agree with plaintiff's first point that it is for a jury to determine whether WIC's reliance on Bestgen was reasonable. The undisputed facts demonstrate that WIC did not rely solely on Bestgen and instead show that WIC had notice that it's legal rights had been invaded and knew the parties that were involved.

**2. Did Failure of the Trading Program Put WIC on Notice?**

In its second argument, WIC disputes that the failure of the trading program to proceed as promised by April 2000 placed or should have placed it on notice that it had been the victim of a fraudulent scheme. WIC states that the trading program had a one year term. WIC states that Vincent Wagner had no knowledge in April 2000, that the entire trading deal had unwound. Therefore, WIC argues that a reasonable jury could conclude that it was reasonable not to suspect or be on notice that its $500,000 had

9

been stolen when no return was paid by April 2000. WIC argues that even under defendant's view of the evidence, Bestgen, Manter and Macari had until December 31, 2000 to make good on the program. WIC also argues that from January 2000 until early 2003, WIC was assured by Bestgen and Manter that the program was viable and would result in WIC receiving its anticipated returns. WIC states that throughout 2000, Bestgen represented to Wagner that although there had been a number of delays, they were still working toward the stated objective. Bestgen also told Wagner that Macari had access to WIC's funds and that he had the funds under his control. Bestgen told Wagner that he and Manter were working with Macari to complete the transaction. WIC states that in April 2001, Wagner personally met with Manter to discuss the status of Wagner's funds. Manter told Wagner that he was still trying to make things work and Manter explained his efforts to make good on the original deal. WIC states that up until April 2003, Wagner was being told by Manter and Bestgen that they were still hopeful that the trading program would succeed.

"Discovery of the facts sufficient to trigger the limitations period is determined by an objective standard and means knowledge of facts which would have been discovered in exercise of due diligence." Korman v. Iglesias, 825 F.Supp. 1010, 1014 (S.D.Fla. 1993), aff'd, 43 F.3d 678 (11th Cir. 1994)(internal citations and quotations omitted). Taking an objective look at the facts, it is apparent that WIC knew in April 2000 that the program was not proceeding as promised. This is evidenced by Mr. Wagner's testimony cited above where he is demanding the return of his money. Why else would a party demand the return of its investment unless they sensed that something had gone awry? There were certainly enough indications by April 2000 to

10

put WIC on notice that its legal rights had been invaded: no trades had been made by the end of 1999 as promised, the trading program had not begun within thirty days of WIC's investment, WIC's funds had been transferred to another party and it had received no return on its investment.

WIC argues Manter and Bestgen were making assurances that the program was still going to take place and that there were simply delays in getting it started.  WIC argues that the jury should be permitted to decide whether WIC was reasonable and justified in believing the representations made by Manter and Bestgen.  Defendant relies on Korman to evidence the fact that reliance on assurances from another party cannot in all instances allow a plaintiff to ignore other facts which put them on notice that their legal rights have been invaded.

In Korman, the plaintiff wrote the Spanish lyrics for a song that was performed by Julio Iglesias.  After she wrote the lyrics, she alleges that she signed a contract which was presented to her by Iglesias' Spanish recording company.  The contract secured her royalties for the lyrics which she had written.  The song was released in 1979.  Between 1979 and 1987 Korman inquired about the status of the contract and the royalties but she did not file suit until January 16, 1990.  Korman argued that she had been assured by Iglesias in 1980 that the royalties would eventually be paid, however the Court noted that she was already aware at that point in time that the royalties were overdue. The Court in the case stated that "[e]ven though Korman claims that she did not know of the injury until she actually learned of the contracts designating Iglesias as the sole author until 1988, the facts show that Korman knew as early as 1980 that she was not being paid royalties, that she knew she was entitled to royalties

11

and that they were overdue." Id. at 1015. The Court concluded that this was sufficient knowledge to trigger the limitations period prior to filing suit in 1986.

Plaintiff attempts to distinguish Korman by arguing that there was overwhelming evidence in that case which demonstrated that the plaintiff knew her legal rights were being invaded. Plaintiff argues that the question of WIC's knowledge is not so decidedly in favor of the defendant. The Court disagrees and finds that there is substantial evidence that WIC knew as early as April 2000 that its rights were being invaded. As in Korman, WIC knew that it was not receiving a return on its investment, WIC knew that it should have been receiving returns and also that the returns were overdue. WIC also tries to argue that it was not a sophisticated investor who knew its legal rights. Again, the Court would disagree, WIC was a limited liability company that was in the business of making investments. Additionally, the deposition testimony establishes that Mr. Wagner made inquiries of the other individuals involved in an attempt to understand why the trading program was not operating as planned. Finally, WIC argues that in Korman, the plaintiff had negotiated royalty agreements before and knew how to judge her rights. WIC argues that it had never invested in a trading program before and it had no other past investments by which it could compare the delay in trading. However, as noted above, even if WIC had not invested in a trading program before, it is clear that WIC had been promised that trading activity was to have started in December 1999 and that after the program began royalties were to be paid on a weekly basis. As previously noted, in April 2000, WIC knew that trading had not begun as promised, it was not receiving the promised return on its investment and it also knew that the its demands for the return of the $500,000 were not being met. WIC did not need to be experienced in trading programs to know that something was amiss. Therefore, the Court finds that

based on the undisputed facts, WIC was on notice in April 2000 that its legal rights were being invaded. Under the Florida four year statute of limitations, WIC should have filed suit no later than April 2004. As suit was not filed until December 2, 2004, the Court finds that it is time barred. As the statute of limitations issue is dispositive of both the fraud and rescission counts, there is no need for the Court to address defendant's other arguments.

## IV. CONCLUSION

Accordingly, the Court hereby **GRANTS** defendant's Motion for Summary Judgment (Doc. # 47) and Defendant's Motion in Limine is **DENIED** as **MOOT**.


Date: March 29, 2006　　　　　　　　　　**S/ FERNANDO J. GAITAN, JR.**
Kansas City, Missouri　　　　　　　　　　Fernando J. Gaitan, Jr.
　　　　　　　　　　　　　　　　　　　　United States District Judge